# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| M.J.C., *a minor child, by and through his Parent and Natural Guardian,* Schaaron Martin | Civil No. 10-4861 (JRT/TNL) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD** |
| SPECIAL SCHOOL DISTRICT NO. 1, MINNEAPOLIS PUBLIC SCHOOLS | |
| Defendant. | |

Amy J. Goetz and Atlee M. Reilly, **SCHOOL LAW CENTER, LLC**, 452 Selby Avenue, 2nd Floor East, St. Paul, MN 55102, for plaintiff.

Laura Tubbs Booth, **BOOTH & LAVORATO, LLC**, 10520 Wayzata Boulevard, Suite 200, Minnetonka, MN 55305, for defendant.

This action involves a fourteen-year-old student who, because he was not classified as having a disability, went for years without the special education services he needed. Plaintiff M.J.C. is a child with disabilities who attends school in the Minneapolis Public School District ("the District"). Schaaron Martin ("Martin") is M.J.C.'s mother and his sole legal and physical custodian. On March 15, 2010, M.J.C. requested an administrative hearing to challenge the District's failure to provide M.J.C. with a free and appropriate public education ("FAPE") under the Individuals with Disabilities Education Act ("IDEA") and the corollary state special education law, Minnesota Statutes § 125A.

3/30/12

42

The Independent Hearing Officer ("Hearing Officer"), Judge James E. LaFave of the State of Minnesota Office of Administrative Hearings, issued a decision on September 15, 2010. (*M.J.C. v. Minneapolis Public Sch. Dist.* (*In re M.J.C.*), OAH 60-1300-21192-9 (2010) ("Administrative Decision").)  The Hearing Officer denied the Plaintiff's challenge on all grounds and ruled that the District had at all times provided M.J.C. with a FAPE. (*Id.* at 19-20.)  On December 10, 2010, M.J.C. filed a complaint with this Court pursuant to the IDEA, 20 U.S.C. § 1415(i)(2)(A), challenging this decision.  Plaintiff and the District both filed motions for judgment on the administrative record.

There are two issues in this action.  The first issue is whether the District violated the IDEA by failing to identify M.J.C. as a child with disability prior to June 2009.  The second issue is whether, once the District began providing M.J.C. with special education services during the 2009-2010 school year, the District complied with the IDEA by providing M.J.C. with a FAPE.  For the reasons discussed below, the Court finds that (1) the District violated the IDEA prior to June 2009 by failing to propose and provide M.J.C. with the evaluations required by law, but (2) the District complied with the IDEA during the 2009-2010 school year by providing M.J.C. with a FAPE under difficult circumstances.

# BACKGROUND

## I.   EDUCATION PRIOR TO MARCH 15, 2008

The Court will summarize M.J.C.'s educational background prior to March 15, 2008, the start of the statute of limitations period, because this background is relevant to the District's later responsibilities. *See* 20 U.S.C. § 1415(f)(3)(C). M.J.C. attended Lincoln Elementary School from 2001-2006, which encompassed most of his kindergarten through fourth grade years. As early as kindergarten, M.J.C.'s teacher expressed concerns that he was hyperactive and that it was difficult for him to sit down and complete projects. (Schaaron Martin Test., Hr'g T. 220:6-19, July 13, 2010.) These concerns continued throughout M.J.C.'s time at Lincoln Elementary. (*E.g.*, *id.* 223:4-10; Elementary Individual Learning Plan, J. Ex. 103, Sept. 30, 2005.)

In the fall of 2005, after M.J.C. started fourth grade, Martin requested that the District assess M.J.C. for academic and behavioral problems. (Martin Letter, J. Ex. 39, Oct. 10, 2005.) The District completed a special education evaluation of M.J.C. and found that M.J.C. did not have a disability. (M.J.C. Special Education Evaluation, Def. Ex. 134, Dec. 6, 2005.)

This evaluation tested M.J.C. in the areas of **special and language impairment ("SLI"), specific learning disability ("SLD"), and emotional or behavioral disorder ("EBD")**[1]. (*Id.*) The District failed to consider whether M.J.C. might qualify for

---

[1] State EBD criteria require that a behavioral impairment be consistently exhibited in at least three different settings. (IEP Evaluation at 345, Dist. Ex. 134); *see also* 34 CFR § 300.8(c)(4); Minn. R. § 3525.1329, subp. 1. M.J.C. did not meet EBD criteria because one

(Footnote continued on next page.)

services under the category of **"other health disability" ("OHD")** due to Attention

Deficit Disorder ("ADD"), although the District knew that M.J.C. was in the process of

being evaluated for suspected ADD.  (*Id.* at 1288.)  The OHD category can qualify

children with ADD or Attention Deficit Hyperactivity Disorder (ADHD) for special

education.    20 U.S.C. § 1401(3)(A); Minn. Stat. § 125A.02, subd. 1; 34 C.F.R.

§ 300.8(c)(9); Minn. R. 3525.1335.

M.J.C.'s doctor, Donald Chadwick ("Chadwick"), M.D., referred M.J.C. for a

psychological evaluation to determine if he had ADHD.  (Werner Evaluation, J. Ex. 98,

at 1, Feb. 5, 2006.)  Dustin Werner ("Werner"), a licensed psychologist, wrote a report

diagnosing M.J.C. with ADHD, Combined Type, on February 5, 2006.  (*Id.*)  Werner

stated in his report, "[M.J.C.'s] school should consider implementing an IEP or a 504

plan, given his inattention and hyperactivity.  Other academic considerations may include

priority seating, smaller class sizes, organizational tools, and decreasing distractions

where possible." (*Id.* at 4.)

The District was notified of this ADHD diagnosis in January 2006, but did not

suggest another special education evaluation of M.J.C.  (Minneapolis Pupil Health

Record, J. Ex. 97.)[2]  Instead, in May 2006, Martin again requested an evaluation to

---

(Footnote continued.)

teacher reported that his behavior was not discrepant for his age and because Martin reported no
behavioral issues for M.J.C. at home or in the community.  (IEP Evaluation at 1293.)

[2] In March 2006, Lincoln Elementary School's Principal proposed that M.J.C. transfer to
Lucy Laney School because M.J.C. "threatens [the] safety of students in the classroom."

(Footnote continued on next page.)

determine if M.J.C. qualified for special education. (Martin Letter, J. Ex. 39, May 2, 2006.) The District claims that Martin refused to allow M.J.C. to be tested for EBD, but the District made no written request to test M.J.C. under this category. (*See* IEP Evaluation, Def. Ex. 48, at 376, June 19, 2006.) The evaluation conducted in June 2006 determined that M.J.C. did not qualify for special education services under SLD criteria because he did not demonstrate significant underachievement. (*Id.* at 380-81.) However, the IEP team again failed to consider whether M.J.C. might qualify for services under the category of OHD due to his ADHD. (*Id.*)

When M.J.C. enrolled in Jenny Lind Elementary School in fifth grade, Martin yet again requested an evaluation. (Martin Test., Hr'g T. 249:1-10.) In November 2006, the District finally evaluated M.J.C. under the OHD category. (IEP Evaluation, Def. Ex. 138, at 9.) M.J.C. would have been eligible for special education under this category, except for one lacking item: he had no written diagnosis of ADHD from a physician. (*Id.* at 10-11.) The District knew that a physician had referred M.J.C. to a psychologist who diagnosed M.J.C. with ADHD, but it deemed the psychologist's diagnosis insufficient. (*Id.* at 9-10; *see also* Linda Henn Test., Hr'g Tr. 192:1-9, July 13, 2010.)

No one at the District seemed to doubt that M.J.C. had ADHD and was in need of services. (Henn Test., Hr'g Tr. at 179:17-21.) Accordingly, school nurse Linda Henn contacted Martin about the need to obtain an ADHD diagnosis. (IEP Evaluation, Def.

---

(Footnote continued.)

(Transfer Agreement, J. Ex. 111, March 13, 2006.) Martin chose to home school M.J.C. for the rest of the year. (Martin Test., Hr'g Tr. 847:9-13.)

Ex. 138, at 1314.)  Henn also faxed paperwork to Chadwick and called Chadwick's nurse

to explain what the District needed.  (*Id.*)  Chadwick responded that he could not verify

that M.J.C. had ADHD until he came in for a follow-up appointment.  (*Id.*; Henn Test.,

Hr'g T. 191:3-9.)  Henn informed Martin of the steps she had taken to obtain an ADHD

diagnosis for M.J.C.  Henn then stopped trying to obtain the evaluation, even though

Henn did not think that M.J.C. ever had a follow-up appointment with Chadwick.  (Henn

Test., Hr'g T. 191:3-9, 193:12-21.)  Chadwick never provided an ADHD diagnosis to the

District.[3]

M.J.C. started sixth grade at Northeast Junior High School.  He had significant

behavioral and academic problems and trouble focusing.  (*E.g.*, Behavior Worksheet, J.

Ex. 37, Oct. 7, 2009.)  According to the District, Martin orally refused to allow the

District to test M.J.C. under the EBD category and continued to state that she would

obtain documentation of M.J.C.'s ADHD.  (Cynthia Atsatt Test., Hr'g T. 1050:16-25,

July 16, 2010.)  The District waited for Martin to obtain this documentation and did not

propose another evaluation of M.J.C., despite the District's knowledge that M.J.C. "really

needed help [and] special education."  (*See id.* 1050:7-15, 1051:5-7.)

---

[3] On December 13, 2006, M.J.C. and Martin visited Chadwick again.  Chadwick requested that Martin fill out some paperwork related to M.J.C.'s suspected ADHD and return for a follow-up appointment. (Chadwick Letter, J. Ex. 130, M-0004, Dec. 13, 2006.)  At the next appointment, Martin did not bring the forms Chadwick requested.  (Chadwick Letter, Dist. Ex. 204, at M-0001, Feb. 7, 2007.)  Martin claims that she did not obtain a diagnosis because Chadwick would not give her one unless she medicated M.J.C., a claim that the Hearing Officer did not find credible.  (*E.g.*, Evaluation Planning Summary, J. Ex. 53, March 15, 2009; Administrative Decision at 21.)

## II.   EDUCATION AFTER MARCH 15, 2008

### A.   Background without Services

In February 2008, in the middle of M.J.C.'s sixth grade year at Northeast, M.J.C. was administratively transferred to Lucy Laney School after displaying dangerous and difficult behaviors.  (Admin. Transfer Form, J. Ex. 51, Feb. 7, 2008.)  M.J.C. received some behavioral interventions from staff at Lucy Laney, as he had in previous schools, but he still did not have an IEP.  (*E.g.*, Melissa Jackson Test., Hr'g T. 699:13-18, July 15, 2010.)   Throughout the remainder of his sixth grade year, M.J.C. had significant academic and behavioral problems, including numerous office referrals and a suspension. (School Discipline Report, J. Ex. 33, at 54-58; Student Profile, Def. Ex. 131, at 2516.)

M.J.C. began his seventh grade year at Lucy Laney.  Despite continuing academic and behavioral problems, including numerous suspensions, staff did not propose a special education evaluation.   (Martin Test., Hr'g T. 270:3-6; Student Discipline Report, J. Ex. 33, at 31-38; Special Educ. Evaluation, Ex. 59, at 519, June 1, 2009.)  Staff at Lucy Laney reported that it was difficult working with Martin.  (E-mail from David Branch, J. Ex. 32, at 402, Nov. 25, 2008.)  Melissa Jackson, the assistant principal at Lucy Laney, testified that Martin was "against the EBD label" because of the overrepresentation of African Americans in EBD programs, but that she and Martin had discussed obtaining special education services on the basis of M.J.C.'s ADHD.  (Melissa Jackson Test., Hr'g Tr. 702:4-703:9.)   In fact, Jackson represented to Martin that EBD testing was not

necessary if M.J.C. obtained an ADHD diagnosis.[4]   Jackson did not propose an evaluation of M.J.C. in writing and relied on Martin to obtain an ADHD diagnosis. (*Id.* 703:10-705:4.)

M.J.C. was again administratively transferred prior to winter break in his seventh grade year, this time to Olson Middle School, because of further serious behavioral problems. (Admin. Transfer Form, J. Ex. 52, Dec. 5, 2008.) The District did not propose a special education evaluation when it transferred M.J.C. (Martin Test., Hr'g T. 270:3-6.)   M.J.C. continued to have academic and behavioral problems, including suspensions. (Special Educ. Evaluation, Ex. 59, at 519, June 1, 2009; Student Profile, Def. Ex. 131, at 2514.)

Martin wrote another letter to the District requesting that M.J.C. receive special education testing based on "behavior, academics and lack of actual classroom participation due to behavior, suspensions and academic knowledge." (Martin Letter, J. Ex. 39, March 3, 2009.)   Conference notes from a meeting between Martin and District staff state, "The team [of District staff] indicated that regardless of the type of testing done (EBD or OHD) the services provided [under the IEP] would be the same." (Conference Summ., J. Ex. 53, March 16, 2009.)

M.J.C. continued to engage in violent and inappropriate behavior, and Olson staff recommended his expulsion on April 13, 2009. (Incident Report, J. Ex. 56, April 13,

---

[4] (*See* Jackson Test., Hr'g T. 702:4-703:9 ("Often there is overrepresentation of African-American males in EBD, and working in EBD programs I've seen that, so I totally understand that . . . [He didn't have] to be EBD, from what I was seeing, that we could go the OHD route . . . .").)

2009.)   On April 27, 2009, the District sent Martin a proposal for a comprehensive evaluation of M.J.C. (Notice of Evaluation, J. Ex. 57, Apr. 27, 2009.)  Although Martin had expressed reluctance to have her son tested for an EBD, she signed the District's request and allowed testing for EBD, SLD, and OHD.  (*Id.*; Evaluation Planning Summary, J. Ex. 58, April 27, 2009 ("Mother indicated that she does not object to any proposed testing however she wants the eligibility label to be correct just not EBD.").)

On May 6, 2009, M.J.C. was administratively transferred for the second time in his seventh grade year, this time to Nellie Stone Johnson. (Special Education Evaluation, Ex. 59, at 505.)  His academic and behavioral problems continued.  (*Id.* at 519; Student Discipline Report, J. Ex. 33, at 42; Student Profile, Def. Ex. 131, at 2514.)

The District evaluated M.J.C. for special education services on June 6, 2009, and finally determined that he was eligible under EBD, SLD, and OHD diagnoses.  (Special Educ. Evaluation, Ex. 59, at 525-26, 584.)  Martin obtained a physician's documentation of ADHD, which led to his OHD qualification. (*Id.* at 584.)

M.J.C.'s witness Janice Ostrom ("Ostrom"), M.A., L.P., BCBA,[5] testified that if supports had been put into place sooner in M.J.C.'s educational career, he would not require the "intensity of supports" that he now needs.  (Ostrom Test., Hr'g T. 464:2-6, July 14, 2010.)  She also stated that there was an "uncharacteristic delay" in the provision

---

[5] Ostrom was the only expert at the administrative hearing qualified in behavioral psychology, and the Hearing Officer found her to be very reliable. (Administrative Decision at 23.)

of special education services for M.J.C., a characterization that the Hearing Officer adopted. (Ostrom Aff., Dist. Ex. 210, at 11; Administrative Decision at 21.)

## B.    Background with Services

In eighth grade, M.J.C. attended Anwatin Middle School.    While there, he received a federal setting II IEP with a variety of services.[6]  Although M.J.C. had an IEP, his behavioral and academic problems continued.  He received fifteen suspensions for a total of thirty-three school days and four in-school suspensions for a total of seven school days.  (Student Profile, Def. Ex. 131, at 2503-09).  M.J.C. engaged in extremely disruptive behaviors, and he was often sent out of class. (Diagnostic Report, J. Ex. 107, at 1905, January 21, 2010.)  Almost all of his IEP goals were rated as "not likely to be achieved."  (Progress Report, J. Ex. 88, January 19, 2009.)  He failed or received "no credit" for all of his classes.  (Student Profile, Def. Ex. 131, at 2516.)

The District believed Anwatin's setting was improper for M.J.C. and not restrictive enough because he "wasn't doing anything academically."  (Atsatt Test., Hr'g T. 1073:21-1074:10.)  The District held numerous IEP team meetings to adjust M.J.C.'s behavior plan.  (*Id.* 1062:5-21, 1069:12-1070:24.)  District staff reported that it could be difficult to work with Martin.  (*E.g.*, Cy Thompson E-mail, J. Ex. 50, Oct. 23, 2009.)  The

---

[6] M.J.C. received the following services: behavior management for 120 minutes, 5 times each week; math services for 40 minutes, 5 times each week; and writing services, 40 minutes, 5 times each week, for a total of 1,000 minutes (or 16.6 hours) of special education service per week. (IEP, J. Ex. 81, at 1021.) This IEP contained eight annual goals, including two focused on academic skills and six focused on behavioral needs. (*Id.* at 1015-16.) The IEP indicated that M.J.C. would participate in learning and testing in accordance with the Minnesota State standards as written. (*Id.* at 1020.)

District repeatedly proposed a Setting III IEP for M.J.C. because of the belief that Anwatin was not an appropriate fit for him. (IEP Proposal, J. Ex. 84; IEP Proposal, J. Ex. 65, at 634; IEP Proposal, J. Ex. 163; IEP Proposal, J. Ex. 164; Atsatt Test., Hr'g T. 1069:12-1070:24.)

The District's proposed IEPs reduced the number of listed goals for M.J.C., and, instead of using state standards for his academic development, used individualized goals as academic benchmarks. (IEP Proposal, J. Ex. 84; IEP Proposal, J. Ex. 65.) Martin rejected the proposed IEPs, feeling, among other concerns, that they were not sufficiently focused on academics.[7] (IEP Proposal, J. Ex. 84, at 1080; IEP Proposal, J. Ex. 65 at 624.) District staff was extremely concerned and planned to take the rare step of initiating a hearing to override Martin's wishes. (Atsatt Test., Hr'g T. 1075:1-1076:6.) This hearing did not occur because M.J.C. was accused of brandishing scissors as a weapon in school. (*Id.* 1076:19-22.)

After this incident, the District unilaterally placed M.J.C. in a forty-five day placement in a Setting III program, the W. Harry Davis SPAN Program ("SPAN"). (*Id.* 1076:19-1077:9.) The IEP implemented at SPAN was similar to those previously rejected by Martin. SPAN uses a level system, called the SAIL program, which

---

[7] Martin requested an Independent Educational Evaluation ("IEE") of M.J.C., which Groves Academy generated on January 21, 2010. (Groves Report, J. Ex. 108.) The Groves IEE made many recommendations, including providing instruction in a one-on-one or very small group setting. (*Id.*) Martin wanted the IEE's recommendations implemented.

implements a behavior management system common to all students.[8]   M.J.C. continued to do poorly under SPAN's SAIL program.   Ostrom testified that the SAIL program is not well suited to M.J.C.'s needs because it uses "intrinsic motivators" that are ineffective for someone with M.J.C.'s profile.   (Ostrom Aff., Dist. Ex. 210, at 2, 13.)   M.J.C. exhibited disruptive and violent behaviors at SPAN, and received seven suspensions. (Grant Test., Hr'g T. 39:6-12; Student Profile, Def. Ex. 131, at 2510-11.)   His grades continued to be poor.   (SPAN Grade Report, Def. Ex. 2, May 25, 2010.)

After the forty-five day placement term expired on April 29, 2010, the District proposed an IEP that recommended a federal setting IV placement.   (IEP, Def. Ex. 25.) Martin reluctantly agreed to the placement, and M.J.C. was placed at River Bend Education Center.[9]   M.J.C. only attended River Bend for approximately seventeen days. (Lori Nustvold Test., Hr'g T. 311:8-10.)   The program at River Bend was similar to the SPAN placement in that it used SAIL point sheets.[10]   (Id. 316:6-8.)   M.J.C. continued to

---

[8]   Under the SPAN program, students are evaluated every five minutes in four predetermined areas – speaking appropriately, acting appropriately, "in their area," and learning. (Christina Grant Test., Hr'g T. 17:5-23, June 9, 2010.)   M.J.C. received services including 360 minutes of behavior intervention support daily, and 45 minutes each of Math, Reading, and Writing services, for a total of 2,475 minutes (41.25 hours) per week of special education services. (IEP, Dist. Ex. 25, at 1977.)

[9]   SPAN staff did not participate in writing the IEP at River Bend.   (Grant Test., Hr'g T. 119:10-5.)   Also, those drafting the IEP had not seen the Groves Academy evaluation.   (Nustvold Test., Hr'g T. 319:5-16, July 14, 2010.)

[10]   M.J.C.'s IEP included the following services each day: 360 minutes of behavior management, 45 minutes of math, and 15 minutes of writing.   (IEP, Def. Ex. 23, at 11.)   This totaled 2,100 minutes (35 hours) of special education services per week, a reduction of service time from the Setting III IEP.   (Id.)   Unlike the previous IEPs, the River Bend IEP indicated that M.J.C. would be measured by the Minnesota state academic standards.   (Id. at 9.)

have behavioral and academic problems at River Bend, including suspensions. (Incident Reports, J. Ex. 123; Student Profile, Def. Ex. 131, at 2511-12.) At the conclusion of M.J.C.'s eighth grade year, he had been suspended for more than sixty-eight days. (Suspension Report, J. Ex. 188, June 8, 2010.)[11]

Ostrom stated that she cannot recall a time when she has worked with a student who was suspended so often or has had so many placements over a three-year period. (Ostrom Test., Hr'g Tr. 497:16-23.) According to Ostrom, these suspensions honored the function of M.J.C.'s behaviors and reduced the District's success in educating him and addressing his behaviors. (*Id.* at 472:4-14; Ostrom Aff., Dist. Ex. 210, at 2.)

Ostrom also testified that Martin has difficulty with terminology and that at times she does not know how to state her requests clearly. (Ostrom Test., Hr'g T. 475:8-11, 480:1-4, 519:1-5.) The Hearing Officer agreed and made a factual finding that Martin had difficulty understanding the IEP process. (Administrative Decision at 22.)

## III.    M.J.C.'S ACADEMIC AND BEHAVIORAL PROGRESS

Despite the numerous academic problems already discussed, M.J.C. has exhibited slight academic progress in recent years. In grade six, his scores on the Northwest Achievement Level Test ("NALT") for math and reading show that he made "more than 1 year's growth" and was "on track" to pass the state required graduation tests. (M.J.C.'s Test History, J. Ex. 31, at 9.) He was not rated as "proficient" in math or reading. (*Id.* at

---

[11] M.J.C. is now placed in a setting IV placement. The Hearing Officer determined that a Setting IV placement is appropriate for M.J.C., and M.J.C. has not challenged this part of the Hearing Officer's decision. (*See* Administrative Decision at 23.)

9-10.)  In grade seven, his NALT results show that he made about a year's growth in math while his reading score declined slightly.  (*Id.* at 10.)

In grade eight, after M.J.C.'s special education services were implemented, his NALT results show that he made more than one year's growth in math while experiencing another decline in reading.  (*Id.*)  In eighth grade, a screening of M.J.C.'s reading showed some progress in written expression and began using correct ending punctuation.  (Testing Results, Dist. Ex. 173, April 13, 2010.)  While M.J.C. has had many academic difficulties, both before and after the implementation of his special education services, there were some areas of slight improvement.

In contrast, M.J.C. has shown no behavioral progress.  (*See* Ostrom Test., Hr'g T. 497-98.)  Instead, his behavior problems have remained the same or worsened year after year.  His suspensions and difficult behaviors have impeded his educational progress.

## ANALYSIS

### I.   STANDARD OF REVIEW

Under the IDEA, a party may seek review of an administrative decision by bringing an action in federal district court.  20 U.S.C. § 1415(i)(2)(A).  The Court must review the administrative proceedings, hear additional evidence if necessary, and determine whether the preponderance of the evidence shows that the District complied with the IDEA's requirements.  *K.E. ex rel. KE v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 803 (8th Cir. 2011).  The Court "may make a decision on the merits, even if there exist,

upon the stipulated Record, disputed issues of material fact." *Slama ex rel. Slama v. Indep. Sch. Dist. No. 2580*, 259 F. Supp. 2d 880, 882 (D. Minn. 2003).   The party challenging the decision – in this case, M.J.C. – has the burden of proof. *E.S. v. Indep. Sch. Dist. No. 196*, 135 F.3d 566, 569 (8th Cir. 1998).

In reaching its determination, the Court must give "due weight" to the agency's decision-making because the Hearing Officer had the opportunity to observe the witnesses and because the "court should not substitute its own notions of sound educational policy for those of the school authorities" that it reviews. *Id.* (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)).   This standard is less deferential than the substantial-evidence standard. *Slama ex rel. Slama*, 259 F. Supp. 2d at 882.

A primary purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education [FAPE]."   20 U.S.C. § 1400(d)(1)(A).   The Court must engage in a two-party inquiry when determining compliance with the IDEA. *K.E. ex rel. K.E.*, 647 F.3d at 804.   First, the Court must decide if the school district followed the IDEA's procedures. *Id.*   Second, the Court must determine whether the student's education was "reasonably calculated to enable the child to receive educational benefit." *Id.* (quoting *Rowley*, 458 U.S. at 206-07).   Even if a school district violated IDEA procedures, it does not automatically follow that the school district has denied the student a FAPE. *Id.*   Rather, a violation of the IDEA will be "set aside only if the procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parent's opportunity to participate in the formulation

process, or caused a deprivation of educational benefits." *See id.* (internal citation omitted).

## II.   CHILD FIND

### A.   Child Find and Evaluation Obligations

In order to ensure that all children with disabilities receive a FAPE, school districts have a "child find" obligation. 20 U.S.C. § 1412(a)(3). Pursuant to this obligation, districts must ensure that:

> All children with disabilities residing in the State . . . regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.

20 U.S.C. § 1412(a)(3)(A); *see also* Minn. R. § 3525.0750. Children with disabilities, as defined by the IDEA, are children who "need[] special education and related services." 20 U.S.C. § 1401(3)(A)(ii).

Once a child is identified as potentially having a disability, the child's District "**shall** conduct a full and individual evaluation" to determine whether the child has a disability. 20 U.S.C. § 1414(a)(1)(A) (emphasis added); Minn. R. § 3525.2710, subp. 1; *see* Minn. R. § 3525.0800, subp. 3. "The district **shall** administer such tests and other evaluation materials as may be needed to produce the data identified by the IEP team" to determine whether a child has a disability. Minn. R. § 3525.2710, subp. 4(B) (emphasis added). The District must use a variety of assessment tools, and must assess the child in **all** areas of suspected disability. 20 U.S.C. §§ 1414(b)(2)(A)(i), (b)(3)(B); Minn. R. §

3525.2710, subp. 3(B-C) (emphasis added).  Assessment tools the District must provide include medical services, which are "services provided by a licensed physician to determine a child's medically related disability that results in the child's need for special education and related services." 34 C.F.R. § 300.34(c)(5).

School districts must obtain the consent of a parent before evaluating a child for a disability.  20 U.S.C. § 1414(a)(D)(i)(I); Minn. Stat. § 125A.091, subd. 5.  If a parent refuses consent, the agency is not liable for failing to provide the child with a FAPE.  20 U.S.C. §§ 1414(a)(C)(ii)(II), 1414(a)(D)(ii)(III)(aa).

Local education agencies are required to follow certain notice requirements when proposing to evaluate a child.  20 U.S.C. § 1414(b)(1); Minn. Stat. § 125A.091, subd. 3a; Minn. R. §§ 3525.3600; 3525.2710, subp. 3(A).  The notice to the parent of the child must be **written**.  20 U.S.C. § 1415(b)(3); Minn. R. § 3525.2710, subp. 3(A); 34 C.F.R. § 300.503(a)(1).  It must include a description of why the agency proposes to evaluate the child, a statement that the child has certain protections, sources for parents to contact for understanding of the proposal, a description of options considered by the IEP team, and a statement of relevant factors related to the agency's proposal.  20 U.S.C. § 1415(c)(1); Minn. R. § 3525.2710, subp. 3(A); 34 C.F.R. § 300.503(b).  After receiving these notices, the parent may consent or object to an evaluation, and the failure to respond is considered consent.  Minn. Stat. § 125A.091, subd. 3a.  Once the District receives parental consent, it must evaluate the child within thirty days.  Minn. R. § 3525.2550.

### B.    Child Find Violation

The Hearing Officer held that the District did not violate its child find responsibilities regarding M.J.C.  Specifically, the Hearing Officer found that

> [t]he District repeatedly requested that Student's Mother allow them to test the Student under the EBD criteria, but she refused.  The School District also made numerous attempts to obtain written documentation of Student's ADHD diagnosis from the doctors.  The School District made a good faith effort to qualify the Student for special education services.

(Administrative Decision at 21-22.)   Although the Court agrees with the factual underpinnings of this statement, the Court finds that the District did not engage in the child find efforts required by law.   Specifically, the District committed a child find violation by failing to fully evaluate M.J.C. and failing to propose needed evaluations in writing.   This violation was not merely procedural, because it denied M.J.C. a FAPE from March 15, 2008 until the end of the 2008-2009 school year.

### i.    Failure to Evaluate

The IDEA requires that a school district "ensure that . . . the child is assessed in all areas of suspected disability."  20 U.S.C. § 1414(b)(3)(b).  As part of that requirement, school districts must provide "medical services," including evaluations by physicians, when needed.  34 C.F.R. § 300.34(c)(5).  Because medical services identify children's disabilities and their need for special education, it is not a prerequisite to receiving these services that a child has already been qualified as having a disability.  *See id.*

It is understandable that the District was frustrated by Martin's failure to provide a physician's diagnosis. But when a child like M.J.C. is so obviously failing, and his disability and need for special education are known, the law requires the District to act.

Numerous courts have held that school districts cannot shift their assessment responsibilities to parents.[12] The United States Department of Education has likewise stated that a school district "must ensure" that a medical evaluation by a licensed physician is conducted, if necessary to determine whether a child has a disability. *See Letter to Parker*, 18 IDELR 963, at *2 (OSEP 1992); *Letter to Anonymous*, 34 IDELR 35, at *2 (OSEP 2000). The Minnesota Department of Education (MDE) took the same view in *Osseo Independent School District #279*, 106 LRP 11663 (Minn. State Educational Agency 2005). The student in *Osseo* was diagnosed with depression, and the District failed to conduct a full evaluation of the student's disabilities. *Id.* at *4-5, 9-11. In so doing, the District

---

[12] *N.B. and C.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1209 (9th Cir. 2008) (internal citations omitted) ("[The school] did not fulfill its statutory obligations by simply referring [the student's] parents [for an evaluation]. Such an action does not 'ensure that the student is assessed' as required by 20 U.S.C. § 1414(b)(3)(C) . . . A school district cannot abdicate its affirmative duties under the IDEA."); *M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996) ("[A] child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) nor be abridged because the district's behavior did not rise to the level of slothfulness or bad faith."); *N.G. v. District of Columbia*, 556 F. Supp. 2d 11, 29 (D.D.C. 2008) ("The burden is on [the district] to identify and evaluate students suspected of being disabled . . . [T]he IDEA requires that [the district] evaluate [the student] itself."); *Nesbit v. District of Columbia*, No. 01-2429, 2003 U.S. Dist. LEXIS 26306, at *21-22 (D.D.C. March 31, 2003) ("Even though a parent may help a school district to satisfy the IDEA's requirement that it identify children in need of services, the school district is not relieved of its requirement to further locate and evaluate those children.").

mistakenly shifted its burden to arrange for [a disability] diagnosis onto the Student. Once the District agreed to conduct a further evaluation in the area of OHD, it had the responsibility to assure a complete evaluation. This includes procuring medical services, such as a medical diagnosis from a licensed physician if necessary for a complete evaluation, and ensure these services are at no cost to the parent. See 34 C.F.R. § 300.24(b)(4) and Minn. R. § 3525.1335 . . . The District has the responsibility to ensure that it fully assesses the Student in all suspected areas of need before the evaluation can be complete. This including arranging for a medical diagnosis and considering all relevant data available to the District . . . [The District violated the IDEA] when it failed to ensure the Student received a full and individual education, by arranging for a medical diagnosis, and failed to implement the required procedures for evaluating and determining the Student's eligibility and need for special education services.

*Id.* at *15. School districts are required to provide the medical evaluations necessary to fulfill their child find responsibilities.[13]

In failing to fully evaluate M.J.C., the District denied him a FAPE. This case is not one where the child received a FAPE even though the school district failed to obtain information from a physician. *Cf. Fort Osage R-1 Sch. Dist. v. Sims ex rel. Sims*, 641 F.3d 996, 1004 (8th Cir. 2011) (finding that, even if the school district failed to diagnose a child's autism, the failure did not deprive the student of a FAPE); *K.E. ex rel. K.E.*, 647 F.3d at 805 (holding that the school district adequately considered the evaluations provided by physicians). M.J.C. would have received special education services from March 15, 2008 until the end of the 2008-2009 school year if the District had provided

---

[13] The Court need not decide exactly what "services provided by a licensed physician" the District was required to offer, because the District provided M.J.C. with no such services. *See* 34 C.F.R. § 300.34(c)(5). It did not even offer to set up or pay for an appointment. Likewise, the Court will not decide whether M.J.C. required a diagnosis from a physician or a psychologist because, either way, the District was obligated to ensure that M.J.C. was assessed in all areas of suspected disability. *See* 20 U.S.C. § 1414(b)(3)(b).

him with medical services and a full evaluation of his OHD. This delay in special education services denied M.J.C. a FAPE through the 2008-2009 school year and led, at least in part, to the "intensity of supports" that that he now needs. (*See* Ostrom Test., Hr'g T. 464:2-6.) The District's procedural violation led to a very real and significant violation of the IDEA.

### ii.    Failure to Request Evaluations

The District informally requested on multiple occasions that Martin permit evaluations of M.J.C.'s disabilities, including EBD testing. The Eighth Circuit has held that such failures to put requests in writing do not violate the IDEA unless they deny a child a FAPE. *See M.M. v. Special Sch. Dist. No. 1*, 512 F.3d 455, 465 (8th Cir. 2008) (holding that a school district did not violate the IDEA when it failed to formally offer a parent a setting III placement that was appropriate for the child, after the parent orally rejected this placement).[14]   Considering the evidence as a whole and giving due weight to the Hearing Officer's decision, the Court finds that the District's failure to propose evaluations in writing denied M.J.C. a FAPE. The IDEA's procedures were intended to prevent children like M.J.C. from suffering educational setbacks like those exhibited in this case because of informal conversations and miscommunications.

---

[14] This case demonstrates the importance of school districts complying with the IDEA's procedures, however, because the failure to comply requires the Court to speculate about what would have happened if the district had followed the law. *See Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994) ("The requirement of a formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later . . . .").

As the Hearing Officer found, Martin expressed reluctance on numerous occasions about having have her son tested for EBD. However, this reluctance appears to have been largely the result of miscommunications and Martin's confusion about the process. The record indicates that Martin was told more than once that M.J.C. could receive the services he needed through the OHD label. (*See* Conference Summary, J. Ex. 53, March 16, 2009; Jackson Test., Hr'g T. 702:4-703:9.) If Martin thought that EBD testing was unnecessary, it is understandable that she would instead want her son tested under the OHD category, given her concerns about the over-representation of African American males labeled as EBD. The record also shows that Martin was concerned that District staff might focus only on the EBD category instead of giving M.J.C. a more thorough evaluation that included considerations of his ADHD. (*See* Evaluation Planning Summary, J. Ex. 58, June 1, 2009.)

Martin signed numerous releases allowing the school to assess M.J.C. and to view his medical records.[15] Martin asked the District to conduct evaluations of M.J.C. many times, including evaluations of his behavior.[16] She consented to **every** evaluation

---

[15] Martin signed releases for these purposes on October 13, 2005, May 30, 2006, October 23, 2006, and November 16, 2006. (J. Ex. 40, J. Ex. 46.)

[16] Martin wrote letters to the District requesting special education evaluations for her son, dated October 10, 2005, May 2, 2006, March 9, 2009, and October 26, 2009. (Letters from Martin to the Dist., Ex. 39.) The letters from 2005 and March 2009 specifically request an assessment of M.J.C.'s behavioral issues. (*Id.*) Furthermore, the letter from October 2009 states, "I think he needs a third party to evaluate his academic needs, I dont [sic] under stand [sic] any of this, I have said that many times." (*Id.*)

proposal sent to her in writing by the District, including two EBD evaluations.   The

Hearing Officer found that Martin

> clearly is a devoted parent who only wants what is best for her child and
> she is doing everything in her power to see he succeeds. She has done her
> best to educate herself about the special education system.  As noted by
> Ms. Ostrom, however, Student's Mother has trouble fully understanding the
> terminology and the process.[17]

(Administrative Decision at 22.)

Given Martin's frequent requests for testing and consent to all written evaluation

requests, the Court finds it likely that Martin would have allowed the District to test

M.J.C. for EBD or OHD on other occasions, if these requests had been in writing and

explained as required by law.  *See El Paso v. Richard R.,* 567 F. Supp. 2d 918, 947-98

(W.D. Tex. 2008) ("Federal law in this regard is clear; whether parents agree . . . or not,

local educational agencies must comply with their IDEA responsibility to provide written

notice upon their refusal to evaluate a child for special education services.").   In

particular, Martin would have benefited from a written description regarding why the

District believed it critical to evaluate M.J.C. for EBD.  *See* 20 U.S.C. § 1415(c)(1); 34

C.F.R. § 300.503(b); Minn. R. § 3525.2710, subp. 3(A).

Because the District failed to comply with its child find obligations, there was an

uncharacteristic delay in evaluating M.J.C. that denied him a FAPE through the end of

---

[17] The District argues that Martin had sufficient knowledge of her rights because she
received notices of procedural safeguards from the District. (*See* Notice of Proc. Safeguards,
Def. Ex. 193.)  However, the notice states, "The district must provide you with prior written
notice each time it proposes to initiate [the] evaluation . . . of your child . . . ." (*Id.* at 1.) Instead
of providing clarification, the Court finds that this notice had the potential to confuse Martin
further because of the District's lack of compliance with its own stated policies.

the 2008-2009 school year.  Although M.J.C. made slight academic progress before he received special education services, his overall academic progress was poor, including some areas of decline, and his behavioral progress was nonexistent.  M.J.C. faces significant challenges that are due, at least in part, to the District's failure to engage in its child find obligations.  (*See* Ostrom Test., Hr'g T. 464:2-6.)  "There may be instances in which an educational program that results in such slight progress is sufficient to comply with the statute in light of the student's disability, but this is not such a case."  *See C.B. ex rel. B.B. v. Special School Dist. No. 1, Minneapolis, Minn.*, 636 F.3d 981, 990 (8th Cir. 2011).

## III.    ADEQUACY OF IEP

The Court must next consider whether M.J.C. received a FAPE after the District implemented his special education services during the 2009-2010 school year.  Although the events of the school year were unfortunate and M.J.C. made little educational progress, the Court finds that the District provided M.J.C. with a FAPE.

First, M.J.C. spent much of the school year in an inappropriate setting because Martin refused to allow him to transfer to a more restrictive placement.  Shortly after the school year began, the District proposed in writing that M.J.C. transfer to a more restrictive setting.  The District made numerous changes to M.J.C.'s IEPs in an attempt to provide him with a FAPE.  (*See* Administrative Decision at 19.)  Martin refused to accept the IEPs or to allow M.J.C.'s transfer despite M.J.C.'s need for a more restrictive setting.

(*See id.* at 20.)  The District cannot be held responsible for Martin's failure to consent to a more restrictive setting.

Second, once M.J.C. moved to more restrictive settings, he was there for short periods of time.  M.J.C. spent only forty-five days at the SPAN program and only seventeen days at River Bend.  The District cannot be held liable for failing to substantially increase M.J.C.'s academic progress over such short periods, particularly in light of M.J.C.'s significant behavioral difficulties.  (*Id.* at 15 (noting M.J.C. "has a very prominent behavior profile that is extremely challenging and is impeding his education.")); *see CJN v. Minneapolis Public Sch.*, 323 F.3d 630, 642 (8th Cir. 2003) ("Academic and behavioral matters . . . are not always independent of each other.").

Third, there is insufficient support to meet M.J.C.'s burden of proving that the SAIL program at SPAN or River Bend was insufficiently tailored to M.J.C.'s educational needs.  "The courts must be careful to avoid imposing their view of preferable educational methods upon the States."  *See Bd. of Educ. v. Rowley*, 458 U.S. 176 at 178.  M.J.C. made slight academic progress during the school year.  Given the extreme challenges posed in educating M.J.C., including his placement in an inappropriate setting for much of the time, the Court finds that the District provided M.J.C. with some educational benefit under difficult circumstances.

## IV.    RELIEF

M.J.C. seeks compensatory educational services and independent expert consultation services.  Compensatory education services requires a school district "to

belatedly pay expenses that it should have paid all along" to educate a child. *Miener ex rel. Miener v. Missouri*, 800 F.2d 749, 753 (8th Cir. 1986); *see also* Minn. Stat. § 125A.091, subd. 21. "[T]he presumption appears to be that the appropriate and reasonable level of reimbursement will match the quantity of services improperly withheld." *Westendorp v. Indep. Sch. Dist. No. 273*, 35 F. Supp. 2d 1134, 1137 (D. Minn. 1998) (internal quotation marks omitted).

Neither M.J.C. nor the District has presented a clear proposal to the Court about the amount or type of compensatory education needed to remedy the District's child find violation. Accordingly, the Court remands this action to the State of Minnesota Office of Administrative Hearings for a determination of what compensatory education M.J.C. is due, including any independent expert consultation services that may be warranted. M.J.C. was denied a FAPE for the time period between March 15, 2008 until the end of the 2008-2009 school year. In determining the appropriate amount of compensatory education due to M.J.C., the Hearing Officer should consider the amount of time and services needed to compensate M.J.C. for the lack of special education that he received during this time period. *See Strawn v. Mo. State Bd. of Educ.*, 210 F.3d 954, 959 (8th Cir. 2000) (noting that a child may be entitled to compensatory education for a time period longer than the period within the statute of limitations, if necessary to compensate the child for the denial of a FAPE).

M.J.C. also seeks attorneys' fees and costs pursuant to 34 C.F.R. § 300.517. The Court reserves its decision regarding this request. Within thirty days after the Hearing Officer's decision on remand, M.J.C. may file a motion with this Court seeking

attorneys' fees and costs.  The District will have fourteen days to respond to any such motions.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiff M.J.C.'s motion for judgment on the administrative record [Docket No. 26] is **GRANTED in part** and **DENIED in part**.  The motion is **GRANTED** on the child find claim, and **DENIED** on the separate denial of a free and appropriate education claim.

2.      Defendant Special School District No. 1, Minneapolis Public Schools' motion for judgment on the administrative record [Docket No. 23] **GRANTED in part** and **DENIED in part**.   The motion is **GRANTED** on the separate free and appropriate education claim and **DENIED** on the child find claim.

3.      This matter is **REMANDED** to the State of Minnesota Office of Administrative Hearings for a determination of what compensatory education is due to Plaintiff M.J.C.

4.      Plaintiff may file motions for attorney's fees and costs with this Court within thirty (30) days of the State of Minnesota Office of Administrative Hearings'

decision on remand.   Defendant may respond within fourteen (14) days to any such motion filed by Plaintiff.

5.      The parties show cause on or before twenty (20) days from the date of this Order why the Court should not unseal the Order, and to specify any portion of the Order warranting redaction.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  March 30, 2012
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge